Nancy Russell Gwaltney ("Nancy"); her three children, Eugene C. Gwaltney III ("Eugene"), Nancy Gwaltney Klopman ("Klopman"), and George Walker Gwaltney ("George"); and two family partnerships, Gwaltney Investment, Ltd. ("GIL"), and Gwaltney-Baird Investments, Ltd. ("GBIL"), appeal from a summary judgment in favor of Benjamin Russell ("Benjamin") on Benjamin's complaint seeking specific performance of a 1985 contract. We affirm.
 I. Facts and Procedural History
The late Benjamin C. Russell (hereinafter referred to as "the testator"), who had no children, created in his will the Russell Trust, naming his wife Edith as the beneficiary thereof during her lifetime or until she remarried. The assets of the Russell Trust included shares of Russell Lands, Inc. Upon either Edith's death or remarriage, the trust would terminate and the trust assets would be distributed to the testator's three siblings — Elizabeth R. Alison, Robert A. Russell, and Thomas D. Russell. Edith and the testator's three siblings were the original trustees of the Russell Trust. The testator died in 1948. If none of his three siblings were living at the time of Edith's death or remarriage, the trust assets would be distributed to their respective issue. Edith died without remarrying, over 50 years after the death of the testator. All the testator's siblings predeceased Edith.
The appellee in this case, Benjamin, is the son of Robert A. Russell, the deceased brother of the testator, and a nephew of the testator. The principal appellant in this case, Nancy, is the daughter of Thomas D. Russell, another deceased brother of the testator, and a niece of the testator. In 1985, Nancy and Benjamin, who are first cousins, were appointed by the Tallapoosa Circuit Court, along with another cousin, as cotrustees of the Russell Trust. At that time, Benjamin desired to purchase as many outstanding shares of Russell Lands, Inc., as necessary to consolidate ownership of Russell Lands in himself. Specifically, in 1985 Benjamin entered into numerous contracts with other members of the family of his deceased uncle, Thomas D. Russell. Benjamin says he did so in order to obtain all of their then owned shares of Russell Lands, Inc., as well as any future shares they stood to *Page 1127 
receive as a distribution from the Russell Trust.
One of these transactions was with Nancy. Nancy and Benjamin entered into the following agreement (hereinafter referred to as "the 1985 contract"), pursuant to which Nancy agreed to sell her then owned shares of Russell Lands, Inc., as well as any future shares she stood to receive as a contingent remainder beneficiary under the Russell Trust:
 "RECITALS: "WHEREAS, the Undersigned, by virtue of being one of the issue of Thomas D. Russell, has a contingent future or remainder interest (i) under and in a trust established pursuant to Item Three of the Will of Benjamin C. Russell, deceased (the `Trust') and (ii) in the property of the Trust; and
 "WHEREAS, under the terms of the Trust, the Trust will terminate upon the remarriage or death of Edith L. Russell and at that time assets will be distributed to various beneficiaries, including certain of the issue of Thomas D. Russell living at the date of termination of the Trust; and
 "WHEREAS, The Trust presently owns, in addition to other assets, shares of common stock of Russell Lands, Inc.; and
 "WHEREAS, if [Nancy] is living at the time of the termination of the Trust and if the Trust owns shares of common stock of Russell Lands, Inc. at the time of the termination of the Trust, [Nancy] will receive a distribution of shares of common stock of Russell Lands, Inc.; and
 ". . . .
 "WHEREAS, [Benjamin] has agreed to purchase . . . the shares of common stock of Russell Lands, Inc. presently owned by [Nancy] only if [Nancy] enters into an agreement to sell any shares of common stock of Russell Lands, Inc. [Nancy] might receive from the Trust upon its termination; [and]
 "WHEREAS, if [Nancy] receives shares of common stock of Russell Lands, Inc., upon the termination of the Trust, [Benjamin] has agreed to purchase from [Nancy], and [Nancy] has agreed to sell to [Benjamin], all such shares received by [Nancy]. . . .; and
 "WHEREAS, [Nancy] is aware that at the time of the termination of the Trust, the value of a share of common stock . . . may be substantially higher than the sales price provided for in this Agreement; however, [Nancy] is also aware that the value . . . may be lower than the sales price provided in this Agreement and [Nancy] does not wish to take the risk of a decline in the value per share; and
 ". . . .
 "WHEREAS, [Nancy] further recognizes that if [Benjamin] purchases the shares of common stock of Russell Lands, Inc., owned by [Nancy] and other shareholders of Russell Lands, Inc., pursuant to Purchase Agreements in form as that attached as Exhibit A, [Benjamin] will own a majority of the shares of outstanding common stock of Russell Lands, Inc., and [Nancy], by virtue of the receipts of any shares of Russell Lands, Inc., upon termination of the Trust, would be in the position of a minority shareholder in Russell Lands, Inc., a position [Nancy] wishes to avoid; and
 ". . . .
 "NOW, THEREFORE, in consideration of the premises and in consideration of the mutual agreements of the parties set forth hereafter concerning the purchase and sale of the stock . . . *Page 1128 received upon the termination of the Trust . . ., it is agreed as follows:
 "1. Upon the termination of the Trust, [Nancy] will sell to [Benjamin], and [Benjamin] will purchase from [Nancy] all shares of common stock of Russell Lands, Inc. which [Nancy] receives from the Trustees of the Trust upon the termination of the Trust. . . .
 ". . . .
 "3. The closing of the purchase and sale of shares under this Agreement shall take place on the first business day after the date of the distribution of shares . . . by the Trust to [Nancy].
 "4. [Nancy] represents and warrants to [Benjamin] that, if [Nancy] receives shares of Russell Lands, Inc. common stock upon the termination of the Trust, [Nancy] will transfer to [Benjamin] good and valid title to the shares received by [Nancy], free and clear of all liens and encumbrances of any nature.
 "5. The parties recognize that [Benjamin] may not be living at the time of the termination of the Trust. If [Benjamin] is not living . . . the obligation hereunder shall be binding upon the executors or administrators of the estate of [Benjamin]. . . .
 "6. If [Nancy] is not living at the time of the termination of the Trust, [Nancy] agrees that the obligation of [Nancy] . . . to sell shares of Russell Lands, Inc. common stock upon termination of the Trust shall . . . be binding upon [her heirs].
 "7. [Nancy] acknowledges that shares of common stock of Russell Lands, Inc. covered by this Agreement cannot be readily purchased or sold in the open market, that such shares are unique property, that it will be impossible to measure in money the damage to [Benjamin] if [Nancy] fails to comply with any of the obligations imposed by this Agreement . . . and that, in the event of any such failure, [Benjamin] will not have an adequate remedy at law or in damages. Accordingly, [Nancy] consents . . . to the issuance of an injunction for specific performance or the enforcement of other equitable remedies against [Nancy]. . . ."
(Emphasis added.)
In 1992, Nancy assigned her contingent remainder interest in the Russell Trust to GIL, a family partnership. Nancy's late husband, Gene Gwaltney, and her three children — Eugene, Klopman, and George — were the general partners of GIL; Nancy was a limited partner. Nancy's estate-tax attorney sent Benjamin, as one of the trustees of the Russell Trust, a letter informing him of the assignment. GIL subsequently conveyed four percent of its assets to GBIL, another family partnership; Nancy and her stepdaughter are the general partners of GBIL.
In June 2004, Edith died and the trust terminated. Pursuant to the 1985 contract, Benjamin asserted the right to purchase Nancy's shares of Russell Lands, Inc. Nancy, in turn, sent Benjamin a letter stating that she had assigned her contingent remainder interest in the Russell Trust to GIL in 1992 and subsequently, to a small degree, to GBIL; that her husband and children were the general partners of GIL; and that the general partners of GIL intended to retain ownership of the shares of Russell Lands, Inc., and were not interested in selling them for the price proposed in the 1985 contract. Benjamin sued, naming as defendants Nancy, her three children, and the two family partnerships (hereinafter referred to collectively as "the Gwaltneys"), seeking specific performance of the 1985 contract.
The Gwaltneys and Benjamin each filed a motion for a summary judgment. Benjamin *Page 1129 
argued, among other things, that he was entitled to a summary judgment because, he says, the 1985 contract contained only two conditions precedent, both of which had been met: (1) that the Russell Trust, upon its termination, contain shares of Russell Lands, Inc., and (2) that Nancy be alive when the Russell Trust terminated. Benjamin relies on a recital in the contract referring to the circumstance of Nancy's then being entitled to a distribution of shares of stock in Russell Lands upon the occurrence of the two conditions. Benjamin contended that the facts and circumstances surrounding the 1985 contract show that the parties did not intend for Nancy to be able to void the contract by assigning her contingent remainder interest in the Russell Trust prior to Edith's death. The Gwaltneys, on the other hand, argued that they were entitled to a summary judgment because, they say, the 1985 contract was inoperable in that it contained a third condition precedent, i.e., that Nancy must literally "receive" the shares of Russell Lands, Inc., before performing her obligations under the 1985 contract. The Gwaltneys argued that the 1985 contract did not expressly prohibit Nancy from assigning her contingent remainder interest in the Russell Trust and that because she assigned her contingent remainder interest to her family partnership, she never received any shares of Russell Lands, Inc., upon the termination of the Russell Trust and, thus, had none to sell to Benjamin. Although the Gwaltneys and Benjamin asserted that the 1985 contract was unambiguous, each side presented the trial court with these differing interpretations.
The trial court entered a summary judgment in favor of Benjamin, concluding that he was entitled to specific performance under the 1985 contract. Specifically, the trial court determined as a matter of law that the contract was unambiguous in light of the surrounding circumstances and transactions underlying the 1985 contract. The trial court found that the Gwaltneys' assertion that the 1985 contract contained a third condition precedent, i.e., that Nancy must literally "receive" the shares of Russell Lands, Inc., was unreasonable. The trial court also concluded that even assuming the 1985 contract was ambiguous, Benjamin would still prevail based on the undisputed facts and circumstances surrounding the contract, which clearly demonstrated the parties' intentions regarding assignment of Nancy's contingent remainder interest. That is, the parties did not intend or even contemplate that Nancy would avoid receipt of or destroy her right to receive the shares of Russell Lands, Inc., by simply assigning her contingent remainder interest to her own family partnership. Additionally, the trial court concluded that assuming a third condition did exist, the Gwaltneys could not prevail because Alabama law is clear "that a party to contract may not cause a condition to a contract not to occur, then argue that the nonoccurrence renders performance of the contract impossible." Finally, the trial court concluded that as a matter of equity Benjamin was entitled to the shares of Russell Lands, Inc., Nancy had assigned to GIL and GBIL.
The Gwaltneys contend that Benjamin's action seeking specific performance is barred by the doctrine of laches. They further argue that the trial court erred in entering a summary judgment in favor of Benjamin. Specifically, the Gwaltneys assert that the trial court erred in considering parol evidence when the contract itself is unambiguous. The Gwaltneys request that this Court reverse the trial court's judgment and render a judgment in their favor.
 II. Standard of Review
This Court's review of a summary judgment is de novo. Housev. Jefferson *Page 1130 State Cmty. Coll., 907 So.2d 424 (Ala. 2005). Furthermore, "`we apply a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term.'" Mobile Eye Ctr., P.C. v. VanBuren P'ship, 826 So.2d 135, 138 (Ala. 2002) (quotingWinkleblack v. Murphy, 811 So.2d 521, 525-26 (Ala. 2001)).
 III. Doctrine of Laches
The Gwaltneys argue that Benjamin's action seeking specific performance is barred by the doctrine of laches because, they say, they have been prejudiced by Benjamin's 13-year delay in filing an action against them. Nancy assigned her contingent remainder interest under the Russell Trust to her family partnership, GIL, in 1992. As previously noted, Benjamin and Nancy had been appointed, along with another cousin, as cotrustees of the Russell Trust. Nancy's attorney had sent a letter to Benjamin, in his capacity as a cotrustee, informing him of Nancy's assignment of her contingent remainder interest. The letter states, in part: "Please retain this letter and the copy of the assignment in your files which relate to the Trust so that, as Trustees, you will have a record of the correct remainder beneficiary in the event Nancy survives [Edith]." The Gwaltneys claim that this letter provided Benjamin with notice and that he knowingly "slept on his rights" causing them substantial prejudice.
 "Laches is an equitable doctrine designed to prevent unfairness to a defendant . . . due to a plaintiff's . . . delay in filing suit, in the absence of an appropriate statute of limitations. It is based on the public policy discouraging stale demands and is not based upon mere lapse of time. It is principally a question of the inequity of permitting a claim to be enforced where some change in condition has taken place that would make the enforcement of the claim unjust. It is designed to prevent unfairness caused by a party's delay in asserting a claim or by his failure to do something that equity would have required him to do."
Ex parte Grubbs, 542 So.2d 927, 929 (Ala. 1989) (citations omitted). The corollary of the Gwaltneys' position would require that Benjamin, after learning of Nancy's assignment, have forthwith filed an action seeking a judgment declaring that Nancy's assignment of her contingent remainder interest in 1992 was illegal and in violation of the 1985 contract. Because Nancy's remainder interest was contingent upon her surviving Edith and upon the Russell Trust, at its termination, owning shares of Russell Lands, Inc., the question of Benjamin's rights in 1992, before Edith's death, as to Nancy's contingent remainder interest was entirely hypothetical. In Dyess v, Bay John Developers II, L.L.C., [Ms. 2050857, May 25, 2007] (Ala.Civ.App. 2007),* the Court of Civil Appeals accurately summarized this Court's caselaw on the effect of posing a hypothetical question in an action seeking a declaratory judgment:
 "The Declaratory Judgment Act, §§ 6-6-220 through -232, Ala. Code 1975, `does not "`empower courts to . . . give advisory opinions, however convenient it might be to have these questions decided for the government of future cases.'"' Bruner v. Geneva County Forestry Dep't, 865 So.2d 1167, 1175 (Ala. 2003) (quoting Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 944 *Page 1131 
(Ala. 1994), quoting in turn Town of Warrior v. Blaylock, 275 Ala. 113, 114, 152 So.2d 661, 662
(1963)) (emphasis added in Stamps). Our Supreme Court has emphasized that declaratory-judgment actions `must settle a "bona fide justiciable controversy."' Baldwin County v. Bay Minette, 854 So.2d 42, 45 (Ala. 2003) (quoting Gulf South Conference v. Boyd, 369 So.2d 553, 557
(Ala. 1979)). The controversy must be `"definite and concrete,"' must be `"real and substantial,"' and must seek relief by asserting a claim opposed to the interest of another party `"`upon a state of facts which must have accrued.'"' Baldwin County, 854 So.2d at 45 (quoting Copeland v. Jefferson County, 284 Ala. 558, 561, 226 So.2d 385, 387
(1969)). `"[Declaratory judgment proceedings will not lie for an `anticipated controversy.'"' Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C., 828 So.2d 285, 288 (Ala. 2002) (quoting City of Dothan v. Eighty-Four West, Inc., 738 So.2d 903, 908 (Ala.Civ.App. 1999)). Thus, if a declaratory judgment would not terminate any uncertainty or controversy, the court should not enter such a judgment. Bruner, 865 So.2d at 1175; see also Bedsole v. Goodloe, 912 So.2d 508, 518
(Ala. 2005). On the other hand, our Supreme Court has recognized that a purpose of the Declaratory Judgment Act is `to enable parties between whom an actual controversy exists or those between whom litigation is inevitable to have the issues speedily determined when a speedy determination would prevent unnecessary injury caused by the delay of ordinary judicial proceedings.' Harper v. Brown, Stagner, Richardson, Inc., 873 So.2d 220, 224 (Ala. 2003)."
An action by Benjamin seeking a declaratory judgment as to the validity of Nancy's assignment before the occurrence of two events — Nancy's surviving Edith and the Russell Trust owning shares of stock in Russell Lands, Inc., at Edith's death — would have sought resolution of an anticipated controversy, which was by no means inevitable but only hypothetical. Consequently, the bar of the doctrine of laches does not apply to Benjamin's failure to bring an action that would have been subject to dismissal because it was premature.
 IV. Analysis and Conclusion Regarding the 1985 Contract
In construing a contract, the primary concern of the court is to ascertain the true intent of the parties. Parr v.Godwin, 463 So.2d 129 (Ala. 1984). The Gwaltneys and Benjamin both argue that the contract is unambiguous, yet they assert differing opinions regarding its meaning. The fact that the parties disagree about the meaning of the 1985 contract does not, however, make the 1985 contract ambiguous. Wayne J.Griffin Elec., Inc. v. Dunn Constr. Co., 622 So.2d 314
(Ala. 1993). The Gwaltneys insist that once the trial court determined that the 1985 contract was unambiguous, it had a duty to enforce the contract as written, without resort to parol evidence. As previously noted, the trial court grounded its ruling in favor of Benjamin on a series of alternative holdings, the first of which was that, as a matter of law, the 1985 contract was unambiguous in light of the surrounding circumstances and transactions underlying the 1985 contract.
Ingalls Iron Works Co. v. Ingalls, 256 Ala. 124,53 So.2d 847 (1951), a similar case that deserves detailed consideration, dealt with a dispute involving the ownership of stock of Ingalls Iron Works Company, a closed corporation with three principal stockholders — Robert I. Ingalls, Sr.; his wife, Mrs. E.G. Ingalls; and Robert I. Ingalls, Jr. ("Junior"). Junior received as a gift from his father shares of stock of *Page 1132 
Ingalls Iron Works. Each stockholder of Ingalls Iron Works had entered into separate but simultaneous option contracts granting Ingalls Iron Works the right to purchase the stockholder's shares of Ingalls Iron Works stock at a fixed price at the time of the stockholder's retirement or death. Each option contained, among others, the following recital:
 "'Whereas, it is the desire of the Stockholder upon his retirement or death not only to protect the remaining or surviving stockholders of the Corporation by insuring the return of all of his stock to the Corporation, at its election, but also to assure the remaining or surviving stockholders that upon his retirement or death his interest in the Corporation, as herein described, may be retired at the price and under the terms as hereinafter provided.'"
Ingalls, 256 Ala. at 128-29, 53 So.2d at 850.
Following the recitals, the parties agreed that, at any time during the life of the stockholder and for 13 months after his or her death, the corporation had the right to purchase the stockholder's shares of Ingalls Iron Works stock. No reference was made to retirement. The corporation subsequently terminated Junior's employment and sought specific performance of the option agreement. The trial court dismissed the complaint, and the corporation appealed. This Court noted: "This ruling can be upheld, if at all, only on the theory that the bill on its face shows that the event fixed by the option for maturing the right of the complainant to exercise the option has not occurred."256 Ala. at 126-27, 53 So.2d at 848. This Court summarized the corporation's position as follows:
 "The [corporation's] contention reduced to its final analysis is that for and in consideration of $1,000 paid to the stockholder and his wife by the complainant, said option conferred on it the absolute right, on its election, at all times during the life of the stockholder and for thirteen months after his death, for any cause satisfactory to it, on notice to him during his life, or in case of his death to his personal representative, to have said option specifically performed, without regard to the declaration of the facts and the declarations of the circumstances surrounding the parties and attending the execution of the contract stated in the preamble immediately preceding paragraph (1), embodying the operative provisions, and without the stockholder's consent and without voluntary action on his part."
256 Ala. at 127, 53 So.2d at 848-49.
At issue was the alleged conflict between the recitals, referring to retirement as the triggering event during the lifetime of a stockholder, and the operative clauses, purporting to confer a power upon the corporation to exercise the option at any time during the stockholder's lifetime. This Court summarized the principles dealing with conflicts between recitals and operative clauses as follows:
 "The [corporation's] contention is based, in part at least, on the ruling that `Words of recital in an agreement do not have the force of contractual stipulations. Generally if the recitals in a contract are clear and the operative part is ambiguous, the recitals govern the interpretation; but if the recitals are ambiguous and the operative part is clear, the operative part must prevail.' 12 Am.Jur. 776, § 241. And the further contention is made that the recitals in the preamble are ambiguous and self contradicting, hence the court should only look to the operative provisions from the body of the instrument found in paragraph (1). — See 17 C.J.S., Contracts, p. 733. § 314, that `As a general *Page 1133 
rule, recitals in a contract will not control the operative clauses thereof unless the latter are ambiguous; but they may be looked to in determining the proper construction of the contract and the parties' intention.'
 "`Recitals in a contract should be reconciled with the operative clauses, and given effect, so far as possible; but where the recital is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if unambiguous, prevails. (Citing Wilson v. Towers, [55 F.2d 199 (4th Cir. 1932)]; Bellisfield v. Holcombe, 102 N.J.Eq. 20, 139 A. 817 [(1927)]; Williams v. Barkley, 58 N.E. 765, 165 N.Y. 48 [(1900)]; First Nat. Bank Trust Co. of Minneapolis v. U.S. Trust Co., 184 Wash. 212, 50 P.2d 904
[(1935)]; Scott v. [Albemarle] Horse Show Ass'n, 128 Va. 517, 104 S.E. 842 [(1920)]). In other words, recitals, especially when ambiguous, cannot control the clearly expressed stipulations of the parties; (Citing Chicago Daily News v. Kohler, 360 111. 351, 196 N.E. 445 [(1935)]; Irwin's Bank v. Fletcher Savings Trust Co., 195 Ind. 669, 145 N.E. 869 [(1924)]; Hansbarger v. Hansbarger, 206 Mich. 281, 172 N.W. 577 [(1919)]; Martin v. Rothwell, 81 W.Va. 681, 95 S.E. 189 [(1918)]) and where the recitals are broader than the contract stipulations, the former will not extend the latter (Citing Las Alnimas [Animas] Consol. Canal Co. v. Hinderlider, 100 Colo. 508, 68 P.2d 564, 566
[(1937)]; Great Western Oil Co. v. Lewistown Oil and Refining Co., 91 Mont. 146, 6 P.2d 863, 866
[(1932)]). . . . Where the language of the covenants or promises in a contract is more comprehensive than that of the recitals, the intent is to be ascertained from a consideration of the entire instrument (13 C.J. 538, Note 4).' 17 C.J.S., Contracts, p. 733, § 314."
Ingalls, 256 Ala. at 127-28, 53 So.2d at 849-50
(emphasis added).
This Court noted that Junior contended "that the intention of the parties must be gathered from the four corners of the contract interpreted in the light of the occasion which gave rise to the contract, the relation of the parties and the objects to be accomplished." Ingalls, 256 Ala. at 127,53 So.2d at 849.
This Court affirmed the trial court's judgment, stating:
 "These contentions call for an interpretation of said option contract in the light of the applicable law which looks to the situation of the parties at the time it was executed and for that purpose the court will place itself as nearly as possible in the position of the parties when the instrument was executed to ascertain the intention of the parties, the rights to be protected and the objects to be accomplished. Reference may be had to the state of facts as they existed when the instrument was made and to which the parties may be presumed to have had reference. Nettles v. Lichtman, 228 Ala. 5[2], 152 So. 450, 91 A.L.R. 1455 [(1934)]. The rule of the cited case was applied in Williams v. Johns-Carroll Lumber Co., 238 Ala. 536, 192 So. 278 [(1939),] which cited with approval McGhee v. Alexander, 104 Ala. 116, 16 So. 148, 149
[(1894)], from which we reproduce the following: `Contracts must be interpreted in the light of the facts surrounding the parties when they were made. There cannot be a departure from the words of a written contract[;] they must have their full import and force. But to arrive at the true sense in which the parties employed them, courts of necessity consider the occasion which gave rise to the contract, the relation of the parties, and the object *Page 1134 to be accomplished. Pollard v. Maddox, 28 Ala. 321 [(1856)]. As is said by Bishop: "The parties speak in their contract from the fountain of their mutual knowledge, and if we would properly interpret their words, we must put ourselves exactly in their position, and know just what they mutually know, with neither addition nor abatement." Bish. Cont. § 370. . . .'"
Ingalls, 256 Ala. at 127, 53 So.2d at 849 (emphasis added).
This Court then held:
 "After due consideration of all the provisions of the contract, subject matter of this litigation, in connection with the recitals in the preamble, the circumstances in which the parties were dealing and the purposes to be accomplished, as evidenced by such recitals, and in connection with the other options executed by Robert I. Ingalls, Sr. and Mrs. E.G. Ingalls, the father and mother of the respondent contemporaneously with the contract under consideration, we are forced to the conclusion, looking through form to substance, as courts of equity must do, that the three active stockholders were dealing inter sese and for their mutual benefit. We are further of the opinion that the purpose of this dealing was to prevent their respective holdings from passing out of the family and the corporation was stakeholder and depository and a mere bailee to and in the accomplishment of their purpose by holding the stock in that capacity to prevent the delivery of the stock to anyone other than the other stockholders.
 "We are further of opinion when the option contract is considered from its four corners, the recitals therein that, `in the event of retirement' and `It is the desire of the stockholder upon his retirement or death not only to protect the remaining or surviving stockholders of the Corporation by insuring the return of all of his stock to the Corporation, at its election, but also to assure the remaining or surviving stockholders that upon his retirement or death his interest in the Corporation, as herein described, may be retired at the price and under the terms as hereinafter provided,' import voluntary activity in accomplishment of his retirement. Therefore the event contemplated to mature the option and warrant its specific performance has not come to pass.
 "We are also clear to the conclusion that said contract did not contemplate that the corporation through its controlling board or [its] executive officers by removing respondent from the corporate offices which he held at the time said options were executed, would mature the option by forced specific performance in a court of equity, nor authorize the corporation as stakeholder and trustee to convert the stock to the uses and purposes of the corporation or any one else."
Ingalls, 256 Ala. at 136, 53 So.2d at 858 (final emphasis in original; other emphasis added).
We need not consider the trial court's alternative holdings in the instant proceeding because the surrounding circumstances, as evident from the recitals of facts set forth within the four corners of the 1985 contract, are wholly inconsistent with the subsequent conduct the Gwaltneys seek to establish as consistent with the 1985 contract. Specifically, and as previously noted, the 1985 contract recites:
 "WHEREAS, if [Nancy] is living at the time of the termination of the Trust and if the Trust owns shares of common stock of Russell Lands, Inc. at the time of the termination of the Trust, [Nancy] will receive a distribution of shares of *Page 1135 
common stock of Russell Lands, Inc. . . ."
(Emphasis added.)
This recital establishes unambiguously that if Nancy survives Edith and if at that time the Russell Trust owns shares of Russell Land, Inc., Nancy "will receive a distribution of shares of common stock of Russell Lands, Inc." Governed by this statement of fact to which Nancy is bound, subsequent references in the 1985 contract to what Nancy might
receive must clearly be limited to the circumstance of either her failure to survive Edith or her surviving Edith but the Russell Trust having no shares of Russell Lands, Inc., as part of its assets. The Gwaltneys' attempt to broaden the scope of the subsequent references in the 1985 contract, couched in terms that admit of the possibility that Nancy might not receive stock in Russell Lands, Inc., is foreclosed by the earlier recital in the 1985 contract. Put another way, the recital describes a state of facts wholly inconsistent with any subsequent assignment of Nancy's contingent remainder interest to create a situation whereby, even if she survived Edith and the Russell Trust at that time held shares of Russell Lands, Inc., she would not receive a distribution of shares of stock in Russell Lands, Inc.
Returning to Ingalls, in which the language of the operative clause conferring broad authority to exercise the option was more comprehensive than the recital, referring to retirement as the occasion for the exercise of the option during Junior's lifetime, this Court applied the following rule: "Where the language of the covenants or promises in a contract is more comprehensive than that of the recitals, the intent is to be ascertained from a consideration of the entire instrument."Ingalls, 256 Ala. at 128, 53 So.2d at 850. Here, as inIngalls, the more comprehensive references to "if Nancy receives" shares of Russell Lands, Inc., contained in the operative portion of the 1985 contract, when contrasted with the narrower circumstance set forth in the recital describing a set of facts inconsistent with Nancy's having previously assigned her contingent remainder interest, allows us to ascertain the intent from consideration of the entire 1985 contract, including the above-quoted recital. We thus conclude that the 1985 contract unambiguously precludes Nancy's inter vivos assignment of her contingent remainder interest. Even assuming, for the sake of argument, that the operative clauses of the 1985 contract are ambiguous in their references to "if Nancy receives" shares of Russell Lands, Inc., the recitals, under the rule also stated in Ingalls, govern: "[I]f the recitals in a contract are clear and the operative part is ambiguous, the recitals govern the interpretation." Ingalls,256 Ala. at 127, 53 So.2d at 849. As previously discussed, the recital quoted above is inconsistent with Nancy's making an inter vivos assignment of her contingent remainder interest.
 V. Conclusion
Benjamin's action is not barred by the doctrine of laches. The attempted inter vivos assignment of Nancy's contingent remainder interest does not defeat Benjamin's rights under the 1985 contract, which is due to be enforced. The summary judgment in favor of Benjamin is affirmed.
AFFIRMED.
COBB, C.J., and SEE, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the result.
* Note from the reporter of decisions: On December 21, 2007, the Alabama Court of Civil Appeals withdrew the May 25, 2007, opinion in Dyess and substituted another one. The substituted opinion contains the same quoted material. *Page 1136