STUART, Justice.
U.S. Bank National Association (“USB”), successor in interest to Bank of America, N.A., which is the successor by merger to LaSalle Bank, National Association, as trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2004-4 (“the Trust”), and Bank of America, N.A. (“BOA”), separately appeal a $3,920,000 judgment entered against them by the Lamar Circuit Court on trespass and wantonness claims asserted by Chester Shepherd and Emily Faye Shepherd. USB also appeals the trial court’s judgment in favor of the Shepherds on its claims related to an alleged error in a mortgage executed by the Shepherds upon which the Trust had foreclosed. We reverse and remand.
I.
In the late 1970s, the Shepherds began receiving property in Vernon from Emily’s family, culminating in their ownership of three contiguous parcels of real estate located northeast of the intersection of Holli-day Road and Aberdeen Road. As denominated by the parties, “Parcel 1” is located at 48 Holliday Road and houses a residence built by the Shepherds in 1980, “Parcel 2” is located at 3742 Aberdeen. Road and houses a beauty parlor operated by Emily, and “Parcel 3” consists of unimproved pastureland behind and adjacent to the other two parcels.
In April 1999, the Shepherds obtained a $61,000 loan from Superior Bank. That loan was secured by a mortgage; however, the recorded mortgage did not contain a legal description of the encumbered property. In December 2001, the Shepherds secured a home-equity line of credit with Citizens State Bank with a mortgage on Parcel 2.
*304 In approximately October 2003, the Shepherds applied to refinance the April 1999 mortgage loan issued by Superior Bank with H & R Block, Inc. An appraisal was conducted on Parcel 1 in conjunction with that application, which reported the value of the property to be $86,000. Chester and Emily have both testified that it was their intent that the new mortgage encumber Parcel 1; however, at some point during the application process Chester noticed that the legal description of the encumbered property used in the draft documents was actually the legal description for Parcel 2. The conversation log maintained by H & R Block indicates that Chester notified it of a problem with the legal description during the application process; however, the mistake was apparently never corrected, because, when Linda Meadows, an independent notary public, brought the closing papers to the Shepherds on December 26, 2003, the mortgage indicated that the encumbered property was located at “48 Hol[l]iday Road, Vernon,” and that it was the Shepherds’ “residence,” but the attached legal description of the property described Parcel 2, on which was not located the residence but Emily’s beauty parlor. Chester testified that, when he told Meadows of the error in the legal description, she telephoned Mark Muncher, the H & R Block loan officer in charge of the Shepherds’ loan, and that, after speaking with Muncher, she told them that Muncher had instructed her to have them go ahead with the closing and that the error in the legal description would be corrected at a later time.[1] Accordingly, the Shepherds executed all the documents with which they were presented, borrowing $68,800, part of which was used to pay the mortgage-transaction fees and to pay off the balance of the April 1999 Superior Bank note, and approximately $7,000 of which was disbursed to the Shepherds. Chester testified that he contacted Muncher and H & R Block repeatedly in the ensuing months trying to get the error in the legal description corrected but that they took no action regarding the error.
In April 2004, the Shepherds’ December 2003 mortgage was assigned to Option One Mortgage Corporation, a subsidiary of H & R Block. In August 2005, the December 2003 mortgage was assigned to the Trust, which had been created by Lehman Brothers Holdings, Inc., in April 2004, and which was administered by LaSalle Bank, National Association, as trustee until USB replaced it as trustee on September 6, 2011.[2] It appears, however, that Option One Mortgage continued to service the December 2003 mortgage even after it was assigned to the Trust, at least until Option One. Mortgage itself was acquired by Homeward Residential Holdings, Inc., in April 2008 and Homeward Residential began servicing the mortgage.[3] Chester has *305 testified that he telephoned Option One Mortgage multiple times attempting to get the legal description of the property encumbered by the December 2003 mortgage corrected; however, he testified that it never responded to his requests.
Sometime in the early summer of 2004, Chester, who was self-employed, began having health problems that prevented him from working, and the Shepherds fell behind in their payments on the December 2003 mortgage. On August 31, 2004, Chester filed a petition for bankruptcy relief under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama. In that petition, Chester listed Option One Mortgage as a secured creditor pursuant to a mortgage he alleged it held on Parcel 1. However, Chester’s bankruptcy petition was eventually dismissed after he failed to make the payments required by the court-approved repayment plan.
In a letter dated June 27, 2005, the Shepherds were contacted by Morris Schneider & Prior, LLC (“Morris Schneider”), an Atlanta law firm that had been retained to collect on the debt owed Option One Mortgage by the Shepherds.[4] Morris Schneider advised the Shepherds via letter that its collection efforts could include the commencement of foreclosure proceedings on the property located at 48 Holliday Road. Chester attempted to resolve the problem with the legal description in the December 2003 mortgage with Morris Schneider also; however, he states that Morris Schneider was not responsive. In response to Morris Schneider’s collection efforts, however, Chester, on August 8, 2005, filed another Chapter 13 bankruptcy petition. That petition again listed Parcel 1 as being subject to a mortgage held by Option One Mortgage. Tim Wadsworth, the attorney handling Chester’s bankruptcy petition also contacted Morris Schneider on the Shepherds’ behalf multiple times in an attempt to correct the legal description in the December 2003 mortgage; however, he was unsuccessful. The Shepherds simultaneously began efforts to sell Parcel 1 and even brought a prospective purchaser to meet with Wadsworth; however, no sale was completed after Wadsworth advised them all of the title issues stemming from the error in the legal description of the property encumbered by the December 20,03 mortgage.
Meanwhile, on September 9, 2005, Morris Schneider, now aware of the problem with the December 2003 mortgage, filed a substitute mortgage in the Lamar County Probate Court. This substitute mortgage was the same as the December 2003 mortgage with the exception of the legal description of the encumbered property, which was now the legal description for Parcel 3.[5] The Shepherds were not advised that a substitute mortgage had been filed; Morris Schneider presumably acted pursuant to the limited power of attorney executed by the Shepherds at the closing on the December 2003 mortgage. Even after filing the substitute mortgage, however, Morris Schneider did not respond to Wadsworth’s or Chester’s continued efforts to contact it throughout the first half *306 of 2006 regarding the erroneous legal description in the December 2003 mortgage.
Sometime in September 2006, the Shepherds voluntarily moved out of their residence on Parcel 1 and moved into a house they shared with Emily’s brother that was located on yet another parcel of family property adjacent to Parcel 1. The Shepherds were not ordered out of the house by Morris Schneider, Option One Mortgage, LaSalle Bank, the Trust, or any other entity associated with the December 2003 mortgage; rather, they testified that they were tired of dealing with the situation and wanted to avoid any eventual eviction—even though no eviction was imminent because they were protected by the automatic stay imposed when Chester filed for bankruptcy protection in August 2005. Upon moving out, the Shepherds disconnected all the utilities at the residence and also ceased making the required home-insurance premium payments. However, Chester continued to park his vehicle at the residence on Parcel 1, and he also took care of the yard work at times.
On March 26, 2007, the bankruptcy court dismissed Chester’s bankruptcy case because of his failure to make all the required payments under the bankruptcy repayment plan. On August 23, 2007, Morris Schneider mailed the Shepherds a notice indicating that their debt was being accelerated and that a foreclosure sale of the property securing the debt would be held. The legal description of the property attached to that notice and subsequently published in the West Alabama Gazette described Parcel 2. On September 20, 2007, the foreclosure sale was conducted, and the Trust paid $96,624—the amount owed by the Shepherds at that time—to obtain a foreclosure deed. That deed described Parcel 3.
On September 24, 2007, Option One Mortgage took possession of the residence on Parcel 1, installed new locks, and, for the first time, prevented the Shepherds from having access to the residence. Option One Mortgage subsequently listed the residence on Parcel 1 for sale with a real-estate agent and later attempted to sell it via auction as well. During this process, it received broker-price opinions, title reports, and surveys indicating that there were problems with the title to Parcel 1. Those title issues apparently prevented the closure of any sale of Parcel 1 for years, even though, in separate events, the property was once “sold” at auction and, in June 2008, a signed sales contract was executed with a different prospective buyer.
Finally, on approximately August 1, 2011, the Shepherds received a letter from Litvak Beasley & Wilson, LLP (“Litvak Beasley”), a Florida law firm purporting to represent Fidelity National Title Insurance Company, explaining that the December 2003 mortgage and the September 2007 foreclosure deed failed to properly describe the Shepherds’ real property and that the Shepherds needed to execute various documents to correct the issue. However, on August 19, 2011, before any further attempt to address the issue could be made, the residence on Parcel 1 caught fire and was severely damaged, along with Chester’s truck, which was parked in the carport at the time. Force-placed insurance had been obtained for the residence after the Shepherds stopped paying their home-insurance premiums, and the $68,465 that was paid out under that force-placed policy was subsequently applied to the Shepherds’ outstanding loan balance.
On September 28, 2011, an action was filed in the Lamar Circuit Court by Litvak Beasley, purportedly on behalf of “LaSalle Bank, National Association, as trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Ser *307 ies 2004-4,” asking the trial court to quiet and confirm the Trust’s title to Parcels 1, 2, and 3, pursuant to § 6-6-540, Ala.Code 1975.[6] Although the action identified La-Salle Bank, acting as trustee for the Trust, as the plaintiff, LaSalle Bank had actually ceased operations after merging into BOA in October 2007 (see note 2 infra); moreover, USB had been named the new trustee of the Trust on September 6, 2011, approximately two weeks before the complaint initiating this action was filed.
The Shepherds thereafter filed an answer and counterclaims, asserting, as amended, claims of negligence and wantonness, trespass, slander of title, and breach of contract. The gravamen .of their counterclaims was that they had executed a mortgage encumbering Parcel 2, that, a substitute mortgage had then been filed without their knowledge encumbering Parcel 3, that a foreclosure had been noticed for Parcel 2 but the foreclosure deed had purported to convey Parcel 3, and that “LaSalle” had subsequently “exercised possession over Parcels 1, 2, and 3, even though LaSalle never had any interest in Parcels 1 or 2, and despite the invalidity of the foreclosure as to Parcel 3.”
USB thereafter obtained Alabama counsel and, on December 10, 2012, filed an amended complaint that was eventually accepted by the trial court. That amended complaint identified the plaintiff as USB, acting as trustee for the Trust, and noted that USB was the successor in interest to BOA, which was the successor by merger to LaSalle Bank, which had initially acted as trustee for the Trust. The amended complaint further alleged three counts, each providing an alternative basis for the trial court to grant the Trust clear title to Parcels 1 and 2. The first count was an amended version of the claim made in the initial complaint asking the court to quiet title pursuant to § 6-6-540. However, this time USB sought to quiet title only to Parcels 1 and 2—not Parcel 3—and USB accordingly named Citizens State Bank as a defendant based on any interest it-might claim in Parcel 2 as a result of the mortgage executed by the Shepherds encumbering Parcel 2 in December 2001.
The second count set forth in the amended complaint asked the trial court to enter a judgment pursuant to § 6-6-220 et seq., Ala.Code 1975, declaring that the Shepherds’ December 2003 mortgage and the subsequent foreclosure deed obtained after that mortgage was foreclosed upon encompassed Parcels 1 and 2, because, USB claimed, that was the intent of the parties and any error in the documents indicating otherwise was the product of the mutual mistake of the parties and/or a scrivener’s error. The third count asserted by USB asked the trial court to reform the legal descriptions of the property subject to the December 2003 mortgage and resulting foreclosure deed pursuant to § 35-4-150 et seq., Ala.Code 1975, inasmuch as, USB alleged, it was the intent of the Shepherds to convey, and H & R Block to receive, an interest in Parcels 1 and 2 at the time the December 2003 mortgage was executed and any failure of the document *308 tó reflect that intent was the result of a mutual mistake and/or a scrivener’s error.
On July 22, 2013, USB moved the trial court to enter a summary judgment on its reformation claim and to dismiss the Shepherds’ counterclaims. USB simultaneously filed a motion noting that it was renouncing any claim to Parcels 2 or 3 and that, accordingly, Citizens State Bank should be dismissed as a defendant; accordingly, on July 31, 2013, the trial court dismissed Citizens State Bank from the case. The Shepherds thereafter stated that they did not oppose the dismissal of their negligence, slander-of-title, and breach-of-contract claims, and, on October 10, 2013, the trial court dismissed those claims, while denying USB’s request for a judgment as a matter of law in its favor on any other claims.
On December 19-20, 2013, the trial court conducted a two-day nonjury trial on USB’s claims and the Shepherds’ wantonness, and trespass claims. On August 12, 2014, the trial court entered a 17-page judgment in favor of the Shepherds on all counts. The trial court specifically declined to reform the December 2003 mortgage because, it reasoned, there was no mutual mistake inasmuch as the Shepherds and H & R Block were both aware at the time the mortgage was executed that the included legal description of encumbered property described Parcel 2, The trial court did not specifically address USB’s arguments invoking § 6-6-540 or requesting a declaratory judgment, but those claims were broadly denied as well.
With regard to the Shepherds’ counterclaims, the trial court held that the Shepherds had proven their trespass claim inasmuch as the Trust’s agents had taken possession of Parcel 1 in September 2007 without any legal right to do so. It further held that the Shepherds had proved their wantonness claim and that the conduct of the various parties toward the Shepherds “was knowing, intentional, malicious and was done in conscious and deliberate disregard, causing damage to the Shepherds.” Accordingly, the trial court awarded the Shepherds $80,000 in compensatory damages based on the loss of their residence, $150,000 for mental anguish suffered by Chester, $750,000 for mental anguish suffered by Emily, and an additional $2,940,000 in punitive damages. This combined $3,920,000 judgment -was entered in favor of the Shepherds and against USB as trustee of the Trust, but also against BOA and LaSalle Bank, although not as trustee.
On September 11, 2014, USB moved the trial court pursuant to Rule 59, Ala. R. Civ. P., to alter, amend, or vacate its judgment or, in the alternative, to order a new trial or to remit the damages. That motion argued that the trial court had committed various errors in the August 12 judgment with regard to the findings of fact, the conclusions of law, and the damages award; however, it also argued that the trial court had erred in entering judgment against BOA and LaSalle Bank. Following a November 14, 2014, hearing, the trial court denied USB’s motion on December 10, 2014.
Sometime in late November 2014; BOA became aware of the judgment entered against it when the Shepherds initiated garnishment proceedings against it. On December 4, 2014, BOA moved the trial court to set aside the judgment against it and LaSalle Bank pursuant to Rule 60(b), Ala. R. Civ. P., inasmuch as, BOA claimed, neither it nor LaSalle Bank had ever owned or serviced the Shepherds’ mortgage and neither was ever served with process or made a party to the underlying action. Essentially, BOA argued,'it was involved in this case only because the original complaint had erroneously listed La- *309 Salle Bank as trustee of the Trust, even though the amended complaint had then noted that USB was the actual trustee of the Trust, having succeeded BOA in that position before the complaint was filed, and that BOA had itself succeeded LaSalle Bank as trustee following its acquisition of LaSalle Bank. On January 27, 2015, the trial court denied BOA’s motion.
USB filed its notice of appeal on January 15, 2015, challenging the judgment entered by the trial court (docketed as appeal no. 1140376). BOA filed its own notice of appeal on February 3, 2015 (docketed as appeal no. 1140450). On March 25, 2015, this Court granted USB and BOA’s joint motion to consolidate the appeals.
II.
This case was decided by the trial court without a jury. This Court has described the standard of review it generally applies to a judgment entered following a bench trial as follows:
“ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ Philpot v. State, 843 So.2d 122, 125 (Ala.2002). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)), ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Id.”
Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005).
III.
On appeal, USB and BOA make a number of arguments; however, we first consider USB’s argument that the trial court should have reformed the December 2003 mortgage to reflect the true intent of the parties to that document that it encumber Parcel 1 as opposed to Parcel 2. Section 35-4-153, Ala.Code 1975, sets forth the applicable law; it provides:
“When, through fraud, or a mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a deed, mortgage, or other conveyance does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, insofar as this can be done without prejudice to rights acquired by third persons- in good faith and for value.”
This Court has further explained that reformation of a deed or mortgage pursuant to § 35-4-153 is appropriate only’ when there is “[c]lear, convincing, and satisfactory” evidence indicating that the conveyance does not truly express the parties’ intent. Mullinax v. Mullinax, 495 So.2d 646, 648 (Ala.1986). See also Beasley v. Mellon Fin. Servs. Corp., 569 So.2d 389, 394 (Ala.1990) (“In order to reform a deed pursuant to the statute so as to express the intentions of the parties thereto, the party seeking reformation has the burden of proving with clear, convincing, and satisfactory evidence that the intention he seeks to substitute was that of both parties.”). We further note that § 35-4-151, Ala.Code 1975, provides that a party bringing a reformation action is “entitled” to reformation once evidence of intent is established.
In this case, there was unambiguous testimony from all the parties to the Decern- *310 ber 2003 loan establishing that they intended for the December 2003 mortgage to encumber only Parcel 1, the lot containing the Shepherds’ residence. Muncher, the H & R Block loan officer who handled the Shepherds’ mortgage application, testified as follows when questioned by counsel for USB:
“Q: In terms of the refinance loan, do you have an understanding of what the mortgage was intended to encumber?
“A: What, .in terms of paying off their—
“Q: What—
“A: —home loan?
“Q: —piece of property was being secured?
“A: Yeah, The residence. Yeah. Their primary dwelling.
“Q: So if the legal description on the eventual loan that is executed didn’t encumber their dwelling house, would that be an error?
“A: Absolutely.”
When questioned by counsel for USB, Chester also repeatedly testified that it was his intent that the December 2003 mortgage encumber Parcel 1:
“Q: Now would it also be fair to say that it was you and your wife’s intent that that mortgage covered the house and lot?
“A: Correct.

"....

“Q: What you and your wife wanted to do was to fix that mortgage so it would cover-the house and lot?
“A: Oh, yes. That’s what we intended to.

"....

[[Image here]]
“Q: That’s what you wanted to do, is to change the—or to correct that so that as opposed to the beauty shop, it was on the house and lot?
“A: That’s—that was my intention, was to mortgage the lot and the house.
“Q: And that intention continued on forward?
“A: Correct. That’s what I wanted to get done, seen about.
[[Image here]]
“Q: But the intention has never changed that that mortgage covered the house and lot; isn’t that correct?
“A: That’s right.”
Subsequently, Emily confirmed Chester’s testimony when counsel for USB asked her about her intent at the time she executed the December 2003 mortgage:
“Q: Is it fair to say that when you closed the 2003 mortgage in December of 2003, that it was your intention that that mortgage cover the house and the lot that you all lived in?
“A: The house. Yes.
“Q: Is it your intention that it did not or should not have covered the beauty shop; is that fair?
“A: Yes.
“Q: It’s your intention it should not have covered the pasture land?
“A: Yes.
“Q: So it was for the house and lot?
“A: Yes.”
Thus, it is undisputed that both H & R Block and the Shepherds intended for the December 2003 mortgage to encumber Parcel 1 rather than Parcel 2. However, in spite of this clear, convincing, and satisfactory evidence indicating that the December 2003 mortgage did not “truly express the intention of the parties,” § 35-4-153, the trial court declined to reform the December 2003 mortgage because, at the time of execution, the parties were cognizant that the property described in the *311 attached legal description was Parcel 2. Thus, the trial court concluded, there was no mutual mistake and § 35-4-153 could not be invoked to reform the December 2003 mortgage. In support of this analysis, the trial court cited Beasley, in which this Court stated:
“Where the sole ground for reformation is mistake, the mistake must be mutual as to all of the parties, but only in the sense that they must all have agreed to the same terms and have mistakenly assumed that those terms were properly expressed in the instrument.”
569 So.2d at 394. The Shepherds argue that nobody “mistakenly assumed” that the legal description in the December 2003 mortgage referred to Parcel 1; rather, they argue, everybody had actual knowledge that the property described was Parcel 2 even though they intended for the property described to be Parcel 1. Thus, they argue, reformation was not appropriate and the trial court correctly declined to apply § 35-4-153.
Section 35-4-153 allows for the reformation of a mortgage “when, through ... a mutual mistake of the parties, ... a ... mortgage ... does not truly express the intention of the parties.” In this case, it is undisputed that a mistake was made—the preparer of the December 2003 mortgage erroneously attached a legal description of Parcel 2 to the document when it is undisputed that the parties intended the mortgage to encumber Parcel 1, and the attached legal description should have described that property. Where this case differs from the “typical” reformation scenario, however, is that the parties apparently recognized the mistake before executing the mortgage, but nevertheless éxecuted it with the intent of correcting the legal description later. The question accordingly becomes whether, if H & R Block and the Shepherds executed the December 2003 mortgage with full knowledge of that mistake, there was, in fact, any mistake at all. ' We conclude that, in this unique circumstance, there was still a mistake such that reformation under § 35-4-153 is appropriate.
This Court has stated that, “[i]n construing a contract, the primary concern of the court is to ascertain the true intent of the parties.” Gwaltney v. Russell, 984 So.2d 1125, 1131 (Ala.2007). In this case, the true intent of all the parties has been made manifest by clear and direct testimony, and it is undisputed that all parties to the December 2003 loan intended for the mortgage to encumber Parcel 1. That was the agreement the parties had made, and the December 2003 mortgage failed to clearly capture that intent only because of a mistake by the preparer. In Beasley, this Court explained:
“Where the reformation is based on mistake, the existence of a valid agreement to which the instrument can be made to conform is essential. The trial court cannot make the instrument express a new contract for the parties. Rather, the principle on which reformation is based is clear—if the intent of the parties was to convey the property actually described, but the parties were induced to enter into the agreement by a mistake as to the extent or nature of the contract, there can be no reformation; however, ‘if the intent was to convey the. property as it was known to exist, but the mistake was in the description, reformation is proper.’ McClintock on Equity, Ch. 8, § 95 at 258 (1948). (Emphasis added.) Such an error establishes mutuality of mistake, and, when one seeks reformation it is immaterial who employed the draftsman.”
569 So.2d at 393-94. Nobody disputes that in this case the Shepherds intended to convey to H & R Block a security interest *312 in Parcel 1, but there was a mistake in the legal description of the property. Therefore, because ‘“the intent was to convey the property as it was known to exist, but the mistake was in the description, reformation is proper.’ ” Id. Although Beasley elsewhere indicates that reformation is proper only when the parties have “mistakenly assumed” that their agreed-upon terms were properly expressed in the document effecting the conveyance, 569 So.2d at 394, nothing in the language of § 35-4-153 prevents reformation merely because the parties were all aware of the mistake in the executed document. The'determining factor is still the parties’ intent, and even at the time the Shepherds and H & R Block were executing the December 2003 mortgage fully aware that the legal description of the encumbered property mistakenly described Parcel 2, it is undisputed that their intent was to encumber Parcel 1 and, in fact, that they thereafter acted as if Parcel 1 were the encumbered property. To decline reformation under these circumstances would require this Court to ignore the undisputed facts and, instead, to effectively enforce a new agreement the parties never made or desired.
Having concluded that USB established by clear, convincing, and satisfactory evidence that it was entitled to reformation of the December 2003 mortgage to reflect, the undisputed true intent of the parties to the December 2003 loan, we turn to the judgment entered on the Shepherds’ trespass and wantonness claims. In Boyce v. Cassese, 941 So.2d 932, 945 (Ala.2006), this Court stated:
“A trespass to property is a wrong against the right of possession or entry. Jefferies v. Bush, 608 So.2d 361, 362 (Ala.1992); AmSouth Bank v. City of Mobile, 500 So.2d 1072 (Ala.1986). If a party enters property or possesses property under a legal right, entry or possession pursuant to that right cannot constitute a trespass.”
In Sharpe v. Wells Fargo Home Mortgage (In re Sharpe), 391 B.R. 117, 159-61 (Bankr.N.D.Ala.2008), the United States Bankruptcy Court for the Northern District of Alabama further considered Alabama law regarding a mortgagee’s right to take possession of mortgaged property after the borrower’s default, explaining:
“Researching possession in the context of a mortgage is complicated under Alabama law because of references in older cases to mortgages where the collateral was personal property not real property. Historically chattel mortgages were common and possession upon default in those situations involved a right to possess the personal property. There is however one case that appears to have established the same general rule for both types of property. The opinion in Harmon v. Dothan Nat. Bank, 186 Ala. 360, 64 So. 621 (1914) includes:
“ ‘Under the theory of mortgages prevailing in this state, nothing can be clearer than the proposition that after default the legal title of the mortgagee is perfect. Indeed, foreclosure adds nothing to the legal title, and its only office and value is to cut off the equity of redemption. The mortgagee’s legal title carries, of course, the right of possession, and, in the case of chattels, possession taken by the mortgagee after default leaves in the mortgagor no interest except an equity of redemption—which is cognizable and enforceable only in a court of equity.’
“[186 Ala. at 363, 64 So.] at 622.
“The above is clarified in Moorer v. Tensaw Land & Timber Co., 246 Ala. 223, 20 So.2d 105 (1944). The opinion there includes:
*313 “ ‘A mortgage effective at law passes the legal title to the mortgagee, who is entitled to the immediate possession of the land even before default, unless it is provided in it (or by separate instrument) that the possession shall remain in the mortgagor.... ’
“[246 Ala.] at 227, 20 So.2d 105.
[[Image here]]
“.., Upon the plaintiffs’ default, the defendant had a right to possession of the property. Because it had a right to possession, it could not be guilty of trespass, whether direct or indirect.”
(Footnotes omitted.) The undisputed evidence in this case similarly establishes that the Shepherds were in default at the time the Trust’s agents allegedly trespassed onto Parcel 1. The December 2003 mortgage explicitly provides that “[i]f Borrower fails to perform the covenants and agreements contained in this security instrument ... then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender’s rights in the Property.” This provision surely entails the right to enter and to secure the subject property. Because the Trust had a right to possession of Parcel 1 at the time of the alleged trespass, it could not be guilty of trespass.[7] The trial court’s judgment in favor of the Shepherds on their trespass claim is accordingly due to be reversed. Boyce, 941 So.2d at 945.
The Shepherds’ wantonness claim similarly was based in large part on actions the Trust’s agents took that were lawful and appropriate based on the Shepherds’ default and the Trust’s security interest in Parcel 1. In its order entering judgment, the trial court described the Shepherds’ wantonness claim as follows:
“The Shepherds have asserted a claim of wantonness based on the actions of the Bank. After it was on notice, the Bank had a duty to stop foreclosure; not take possession; cooperate and communicate with the Shepherds to cure the title problems; allow a sale to avoid foreclosure; put the Shepherds back into possession; cease efforts to sell the residence; and not cloud the title' to other parcels of the Shepherds’ property.”
As explained above, however, once -the Shepherds defaulted, the Trust did have the right to foreclose on Parcel 1, to take possession of Parcel 1, to block the Shepherds from possessing Parcel 1, „ and to attempt to sell Parcel 1. Those actions were within the Trust’s rights as mortgagee, and it accordingly cannot be liable for wantonness based on those actions.
Moreover, to the extent the trial court held that the Shepherds had proven their wantonness claim based on the actions of the Trust that clouded the title to other parcels of property owned by the Shepherds, this Court has rejected the notion that such actions constitute wantonness. In Alabama Power Co. v. Laney, 428 So.2d 21, 22 (Ala.1983), this. Court reversed a judgment entered on negligence and wantonness claims in a property-dispute case, explaining that “[a] review of Alabama law shows that this state does not afford a cause of action for any negligence or wantonness in asserting claim of title to real property in a boundary line dispute.” The Laney Court further explained:
*314 “Each property owner , has a perfect legal right to protect his title. Therefore, this Court finds that there is no reason to create a new cause of action recognizing a legal duty to not assert or claim ownership to real property that is owned or claimed by another. Adequate remedies exist for landowners damaged by assertions of claim by another without the recognition of a new cause of action.
“For example, actions for slander of title are brought under section 6-5-211, Code 1975, which states, ‘The owner of any estate in lands may commence an action for libelous or slanderous words falsely and maliciously impugning his title.’ The language of this statute makes it clear that it was enacted with situations such as this case in mind.”
428 So.2d at 23. Although this is not a boundary-line-dispute case, the same logic applies. If the Shepherds believed the actions of the Trust clouded the title to their other property, they could have pursued a slander-of-title claim. The Shepherds did initially assert such a claim, but they thereafter consented to its dismissal. Under Laney, however, they could not continue to pursue a slander-of-title claim under the guise of a wantonness claim.
The last basis put forth by the trial court for entering a judgment in favor of the Shepherds on their wantonness claim is that the Trust breached a duty to “cooperate and communicate with the Shepherds to cure the title problems.” With regard to this specific claim, and, indeed, all the other wantonness claims previously discussed as well, we note that the relationship between the Shepherds and the Trust is based upon the mortgage and is therefore a contractual one; that is to say, “the duties and breaches alleged by [the Shepherds] clearly would not exist but for the contractual relationship between the parties.” Prickett v. BAC Home Loans, 946 F.Supp.2d 1236, 1244 (N.D.Ala.2013). This Court has held that the proper avenue for seeking redress when contractual duties are breached is a breach-of-contract claim, not a wantonness claim. See, e.g., Barber v. Business Prods. Ctr., Inc., 677 So.2d 223, 228 (Ala.1996), overruled on other grounds by White Sands Grp., LLC v. PRS II, LLC, 32 So.3d 5 (Ala.2009). Following this principle, federal courts applying Alabama law have repeatedly rejected attempts to assert wantonness claims based on a lender’s actions handling and servicing a mortgage once the mortgage is executed. For example, in James v. Nationstar Mortgage, LLC, 92 F.Supp.3d 1190, 1198-1200 (S.D.Ala.2015), the United States District Court for the Southern District of Alabama stated:
“As defendants correctly point out in their motion, a veritable avalanche of recent (and apparently unanimous) federal precedent has found that no cause of action for negligent or wanton servicing of a mortgage account exists under Alabama law. See, e.g., Ott v. Quicken Loans, Inc., [No. 2:13-CV-441-WHA] (M.D.Ala. Jan. 20, 2015) (‘Alabama law recognizes no such form of action in this context. Specifically, there is an emerging consensus that Alabama law does not recognize a cause of action for negligent or wanton mortgage servicing.’) (citations and internal quotation marks omitted); Branch Banking and Trust Co. v. EBR Investments LLC, [No. 2:14—CV-01578-WMA] (N.D.Ala. Jan. 16, 2015) (‘Numerous federal courts, including the undersigned, have concluded that Alabama law does not recognize a cause of action for negligent or wanton mortgage servicing.’) (citations and internal quotation marks omitted); Alverson v. PNC Bank, [No. 14-00387-CB-B] (S.D.Ala. Dec. 15, 2014) (‘Alabama law does not recognize a tort-like cause of action for breach of a duty created by *315 contract, at least not between the parties to a contract; therefore, a mortgagor cannot maintain a cause of action against ... a mortgagee for negligent or wanton servicing of a mortgage contract.’).
“The point is simple. Every single one of these cases (and many others not cited herein) rejects the availability of negligence and wantonness claims under Alabama law under comparable circumstances to those identified by the [plaintiffs]. Every one of these cases undercuts the legal viability of [the plaintiffs’ negligence and wantonness claims], and rejects the very arguments articulated by the [plaintiffs] in opposing dismissal of those causes of action.... This ground having been thoroughly and exhaustively plowed in the aforementioned case authorities, no constructive purpose would be served by re-plowing it here. Suffice it to say that the Court agrees with these decisions’ construction of Alabama law, and particularly their recognition that the mortgage servicing obligations at issue here are a creature of contract, not of tort, and stem from the underlying mortgage and promissory note executed by the parties, rather than a duty of reasonable care generally owed to the public. To the extent that the [plaintiffs] seek to hold defendants liable on theories of negligent or wanton servicing of their mortgage, [those negligence and wantonness claims] fail to state claims upon which relief can be granted.”
(Footnotes omitted.) The James court has correctly stated Alabama law as it applies to claims alleging that lenders have acted wantonly with regard to servicing and handling mortgages. We further note that, in this case, the December 2003 mortgage specifically discusses the correction of clerical errors and provides that “Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.”[8] For all these reasons, the trial court erred by entering a judgment in favor of the Shepherds on their wantonness claim.
IV.
Having concluded that the Trust established that it was entitled to have the December 2003 mortgage reformed to express the true intent of the parties to the December 2003 transaction, it is unnecessary to consider the other bases for relief asserted by USB, including its arguments concerning the amount of mental-anguish and punitive damages awarded by the trial court. Moreover, because the $3,920,000 judgment entered in favor of the Shepherds on their trespass and wantonness claims is due to be reversed, it is also unnecessary to consider whether it was proper for the trial court to enter that judgment against BOA and LaSalle Bank.
The trial court’s judgment is reversed and the cause remanded for the trial court to enter a judgment reforming the December 2003 mortgage consistent with the intent of the parties to the December 2003 transaction as established by the undisputed evidence at trial and for any other proceedings consistent with this opinion.
1140376—REVERSED AND REMANDED.
*316 1140450—REVERSED AND REMANDED.
PARKER, SHAW, and WISE, JJ., concur.
MOORE, C.J., concurs in the result.

. Paragraph 29 of the December 2003 mortgage obligated the Shepherds to assist H & R Block in correcting any clerical errors found to exist in the mortgage, and, during the closing process, the Shepherds also executed a limited power of attorney authorizing H & R Block to correct such errors.

. LaSalle Bank was acquired by and merged into BOA in October 2007; however, actions in this case were still taken in the name of LaSalle Bank even after that date of merger when LaSalle Bank presumably would have ceased operating as a separate entity.

.As the Supreme Judicial Court of Massachusetts has explained in an unrelated case involving many of these same entities—USB, Lehman Brothers Holdings, and Option One Mortgage—the object of the transactions involving the Shepherds' December 2003 mortgage and the Trust was to pool a number of mortgages and then convert them "into mortgage-backed securities that can be bought and sold by investors—a process known as securi-tization.” U.S. Bank, N.A. v. Ibanez, 458 Mass. 637, 641, 941 N,E,2d 40, 46 (2011).

. Morris Schneider stated in that letter that it was representing LaSalle Bank as trustee of the Trust, the creditor on the Shepherds’ loan. No explanation is given for the other evidence in the record indicating that the December 2003 mortgage was not assigned to the Trust until August 2005—after this letter was sent.

. USB asserts that the likely reason why the substitute mortgage erroneously described Parcel 3 instead of Parcel 1 is because the Lamar County tax records indicate that the Shepherds’ homestead claim is attached to Parcel 3.

. Section 6-6-540 provides:
"When any person is in peaceable possession of lands, whether actual or constructive, claiming to own the same, in his own right or as personal representative or guardian, and his title thereto, or any part thereof, is denied or disputed or any other person claims or is reputed to own the same, any part thereof, or any interest therein or to hold any lien or encumbrance thereon and no action is pending to enforce or test the validity of such tide, claim, or encumbrance, such person or his personal representative or guardian, so in possession, may commence an action to settle the title to such lands and to clear up all doubts or disputes concerning the same.”

. This is true even though the December 2003 mortgage had not been reformed at that time. We have held in this opinion that USB is entitled to reformation of the December 2003 mortgage, and reformation, once granted, is “effective as of the date of the instrument to be reformed,” Monroe v. Martin, 726 So.2d 701, 703 (Ala.Civ.App.1998) (citing Beason v. Duke, 246 Ala. 387, 389, 20 So.2d 717, 718 (1945)).

. USB also notes that, although the Shepherds are claiming that they were damaged by the Trust’s extended failure to cooperate in curing the title problems, the Shepherds had the same legal rights as the Trust and could have taken action to reform the December 2003 mortgage or quiet title to their property at any time without regard to the Trust's cooperation or lack thereof. (Trust’s reply brief, pp. 18-19.)