This is an appeal from an order of the Circuit Court of Pike County declaring that the plaintiff, Julian R. Boyd, is eligible to participate in varsity football at Troy State University. We affirm.
On July 12, 1977 the plaintiff Boyd filed his original complaint for a declaratory judgment against the defendant, Gulf South Conference (hereinafter called GSC), asking that the court declare him eligible to participate in varsity football at Troy State University. Boyd's complaint alleged that there is a justiciable controversy between the parties and that Boyd is eligible to participate in varsity football at Troy State University under the provisions of the eligibility rules and regulations of the GSC. Boyd requested the court to declare him eligible for the 1977-1978 football season.
The defendant, GSC, moved to dismiss the complaint or to quash service on the ground that the lower court lacked jurisdiction in the matter, that the complaint failed to state a claim upon which relief could be granted, and on other grounds. Following dismissal of this motion GSC filed its answer to the complaint.
A hearing was held on June 28, 1978. On August 2, 1978 the trial judge found that under the evidence as applied to the rules and regulations of the GSC, Boyd was entitled to the relief requested. The court therefore ordered that Boyd was eligible to participate in varsity football at Troy State University for the 1978-1979 football season provided Boyd was a student in good standing and enrolled at the Troy, Alabama campus of Troy State University for the *Page 555 
Fall Term 1978. Appeal followed in due course.
The essential facts are undisputed. Boyd entered Livingston University in the Fall of 1975 on a full grant-in-aid football scholarship and played on the Livingston University football team during the Fall of 1975. The full grant-in-aid football scholarship awarded to and accepted by Boyd was only for a one-year period (covering only the 1975-76 football season), and was renewable at Livingston University's discretion, subject to Boyd's acceptance. During the 1975-1976 football season both Boyd and Livingston University performed all of their commitments to each other as required by the terms of that one-year scholarship.
At the end of the 1975-1976 school year Livingston University Coach Jack Crowe forwarded Boyd a written offer to renew his football scholarship at Livingston University for the 1976-1977 school year. Boyd did not accept the offer. By telephone Coach Crowe urged Boyd to return and play on the Livingston football team. During that telephone conversation, Boyd informed Coach Crowe that he could not play football as a running back because of an asthmatic condition he had developed. Boyd also informed Coach Crowe that he did not want to return to Livingston University because he wanted to live in Enterprise, Alabama and work part-time with his father while attending Enterprise State Junior College. Coach Crowe then told Boyd that he could be a specialist player as a punter on the team if Boyd's asthmatic condition would not permit him to be a running back. However, Boyd still declined the offer of Livingston University to renew his grant-in-aid and finally told Coach Crowe that for personal reasons he chose not to go back to Livingston University.
Boyd later enrolled at Enterprise State Junior College for the 1976-1977 school year and was graduated in the Summer of 1977. Boyd then discussed with Dr. Stewart at Troy State University the possibility of transferring to Troy and playing on Troy's varsity football team as a punter. He was informed that he had been ruled ineligible by the Commissioner of the GSC. Troy State, thereafter, appealed the Commissioner's ruling to the Faculty Appeals Committee of the GSC. That committee affirmed the Commissioner's ruling that Boyd was ineligible to play football at Troy State.
Both Livingston University and Troy State University are members of the GSC, an unincorporated voluntary athletic association organized by nine colleges and universities. The stated purpose of the GSC is to promote fair competition between the schools by developing rules and regulations mutually agreed upon by the member schools. The Conference is governed by a Constitution, Bylaws and Rules. Enforcement is exercised through the Commissioner of the Conference and a Faculty Appeals Committee. The GSC is also affiliated with the National Collegiate Athletic Association and subject to its rules and regulations.
The GSC eligibility rules at issue here are contained in Article VI, Section 7; Article V, Section 3 (B) and (C); and Article VIII, Section 3, of the GSC Bylaws. GSC Bylaws, Article VI, Section 7, provides as follows:
 A student-athlete who transfers from one GSC school to another will not be eligible to participate in any sport at the second school unless (1) the first one drops that sport and all other GSC rules are complied with, or (2) if the student qualifies under Bylaws Article V, Section 3, B or C, or (3) Article VIII, Section 3.
GSC Bylaws, Article V, Section 3 (B) and (C) provides:
 Section 3. Migrants or Transfers are students who enter a college after having been registered in another college. (Attendance at Summer School excepted.)
 B. Any student who has attended a GSC school but has not been recruited in any way; has not signed a pre-enrollment application, has received no financial aid, and has not participated would be a Transfer upon attending any other GSC school. *Page 556 
 C. When a GSC member does not renew the grant-in-aid of an eligible athlete according to NCAA Constitution 3-4 (d), the athlete becomes a free agent and may be signed by any other GSC school as a Transfer.
GSC Bylaws, Article VIII, Section 3, provides as follows:
 A student-athlete who signs a PRE-ENROLLMENT APPLICATION with one GSC school (and same is duly processed with the GSC Commissioner) cannot participate with any other GSC school, except: A prospective student-athlete who does not accept the grant-in-aid at that school nor participate becomes a free agent at the end of two (2) years and can be signed by any GSC school.
The GSC contends that the lower court's order was erroneous for two reasons; the first being that the lower court was without jurisdiction to intervene in the internal affairs of the GSC.
GSC contends that this Court's decision in Scott v.Kilpatrick, 286 Ala. 129, 237 So.2d 652 (1970) is conclusive on the issue of the lower court's jurisdiction. The Scott case involved a transfer rule of a high school athletic association and not a college athletic association. In Scott the complainant contended that the transfer rule of the Alabama High School Athletic Association was unconstitutional since his right to compete for an opportunity to play high school football involved a property right. The right to play high school football was alleged to be a property right on the ground that a good high school football player had an opportunity for a scholarship in many colleges of this state, and that to declare such a player ineligible to play football denied him an opportunity to compete for such a scholarship. This Court held that participation in high school athletics was a privilege and not a property right. This Court further found that "[i]f officials of a school desire to associate with other schools and prescribe conditions of eligibility for students who are to become members of the school's athletic teams, and the member schools vest final enforcement of the association's rules in boards of control, then a court should not interfere in such internal operation of the affairs of the association."Scott, supra, at 132, 237 So.2d at 655. Scott, however, is distinguishable from the instant case.
Scott involved a high school athletic association while the present case involves a college athletic association. There is a vast difference between high school football and college football. A high school athlete receives no present economic benefit from playing high school football, his only economic benefit being the possibility of his receiving an offer of a college scholarship. The Scott case held that such a possibility was too speculative to recognize as a property right. In contrast, the college athlete receives a scholarship of substantial pecuniary value to engage in college sports. Such scholarships often cover the complete cost of attending a college or university; therefore, the right to be eligible to participate in college athletics cannot be viewed as a mere speculative interest, but is a property right of present economic value. Cf. Byars v. Baptist Medical Center, Inc.,361 So.2d 350 (Ala. 1978), and Carter v. Knapp Motor Co., 243 Ala. 600, 11 So.2d 383 (1943). See also Note, Judicial Review ofDisputes Between Athletes and the National Collegiate AthleticAssociation, 24 Stan.L.Rev. 903 (1972) (hereinafter referred to as Review of NCAA Disputes); and Martin, The NCAA and theFourteenth Amendment, 11 New Eng.L.Rev. 383 (1976). For these reasons Scott v. Kilpatrick, supra is not controlling.
The contention by the GSC that the lower court did not have jurisdiction basically stems from a body of common law involving private associations. See Review of NCAA Disputes,supra; and Chaffee, The Internal Affairs of Associations NotFor Profit, 43 Harv.L.Rev. 993 (1930). The general rule is that courts should not interfere with the internal management of such associations. Mackey v. Moss, 278 Ala. 55, 175 So.2d 749
(1965); and Local Union No. 57, et al. v. Boyd, 245 Ala. 227,16 So.2d 705 (1944). The theory behind this non-interference doctrine is that the individual members of such associations have the freedom to *Page 557 
choose their associates and the conditions of their association; further, it is argued, judicial review of the affairs of such associations would violate this basic principle of the freedom to associate. Still another justification asserted for the existence of the non-interference doctrine is that the rules and regulations upon which these associations operate are often unclear, and the courts would have no available standard upon which to determine the reasonableness of their rules. Chaffee, supra, at 1022. Even though we recognize the existence of this non-interference principle, nevertheless this Court has sanctioned judicial review when the actions of an association are the result of fraud, lack of jurisdiction, collusion, arbitrariness, or are in violation of or contravene any principle of public policy. Scott v.Kilpatrick, supra; Mackey v. Moss, supra; Local Union No. 57,et al. v. Boyd, supra; Medical Society of Mobile County v.Walker, 245 Ala. 135, 16 So.2d 321 (1944); and Weatherly v.Medical and Surgical Society of Montgomery County, 76 Ala. 567
(1884).
We hold that the general non-interference doctrine concerning voluntary associations does not apply to cases involving disputes between college athletes themselves and college athletic associations. There is a cogent reason for this position. In such cases the athlete himself is not even a member of the athletic association; therefore, the basic "freedom of association" principle behind the non-interference rule is not present. The athlete himself has no voice or bargaining power concerning the rules and regulations adopted by the athletic associations because he is not a member, yet he stands to be substantially affected, and even damaged, by an association ruling declaring him to be ineligible to participate in intercollegiate athletics. Thus he may be deprived of the property right eligibility to participate in intercollegiate athletics. While there is a split of authority on the question, cf., e.g., NCAA v. Gillard, 352 So.2d 1072
(Miss. 1977), we agree with the following statement of the Oklahoma Supreme Court:
 It is asserted by the NCAA that judicial scrutiny of the bylaw is inappropriate. Courts are normally reluctant to interfere with the internal affairs of voluntary membership associations, however, in particular situations, where the considerations of policy and justice are sufficiently compelling judicial scrutiny and relief are available. . . . The necessity of court action is apparent where the position of a voluntary association is so dominant in its field that the membership in a practical sense is not voluntary but economically necessary. It was proper for the trial court to examine the validity of the bylaw. [Board of Regents of the University of Oklahoma v. NCAA, 561 P.2d 499, 504 (Okla. 1977)]
We further find that a declaratory judgment action was proper. All that is required for a declaratory judgment action is a bona fide justiciable controversy. East Gadsden Bank v.Bagwell, 273 Ala. 441, 143 So.2d 438 (1962). Such a bona fide
controversy existed on the issue of Boyd's eligibility under the GSC bylaws. This controversy affected a substantial property right. In the past this Court has approved the use of a declaratory judgment action in cases involving voluntary associations which were subject to the non-interference rule.Francis v. Scott, 260 Ala. 595, 72 So.2d 98 (1954).
The defendant GSC also contends that the lower court's order was erroneous because it was contrary to the terms of the GSC transfer rule under the undisputed facts of this case. That contention is untenable. The evidence introduced in the lower court tends to show that Boyd was, in fact, eligible under two of the bylaws. GSC Bylaws, Article V, Section 3 (C) states in effect that an athlete becomes a free agent and may be signed by any other GSC school if a GSC member school does not renewthe grant-in-aid of that athlete. Here Boyd's one-year scholarship was not renewed because, although Livingstonoffered to renew it, Boyd did not accept that offer of renewal. Since there was no renewal of the scholarship, Boyd became a free agent and was free to sign with whatever school he *Page 558 
chose. Livingston University was not obligated to renew or offer to renew Boyd's scholarship, and Boyd was not obligated to accept Livingston's offer. Both parties had performed their obligations to each other and neither party owed any further obligation to the other at the close of the 1975-1976 football season.
Boyd was also eligible under GSC Bylaw, Article VIII, Section 3, which states in pertinent part that "A prospective student-athlete who does not accept the grant-in-aid at that school nor participate becomes a free agent at the end of two (2) years and can be signed by any GSC school." Since Boyd's original scholarship with Livingston was effective only for the 1975-1976 football season, Boyd became a prospective student-athlete for Livingston at the end of his one-year scholarship. Because he did not accept Livingston's offer, did not attend school at Livingston, and did not play football for two years, he became a free agent. The lower court was therefore correct in ruling that Boyd was eligible to play football at Troy State University for the 1978-1979 football season since the 1978 football season occurred at the end of two years after Boyd's refusal to accept the second grant-in-aid offered by Livingston University.
It should be noted that the relationship between a college athlete who accepts an athletic scholarship and the college which awards such an athletic scholarship is contractual in nature. The college athlete agrees to participate in a sport at the college, and the college in return agrees to give assistance to the athlete. The athlete also agrees to be bound by the rules and regulations adopted by the college concerning the financial assistance. Most of these rules and regulations are promulgated by athletic associations whose membership is composed of the individual colleges. The individual athlete has no voice or participation in the formulation or interpretation of these rules and regulations governing his scholarship, even though these materially control his conduct on and off the field. Thus in some circumstances the college athlete may be placed in an unequal bargaining position. The GSC's interpretation of the bylaws in question was that a student football athlete who transfers from one GSC school to another will not be eligible to participate in football at the second school unless the first school drops football or unless the first school does not (merely) offer to renew the grant-in-aid scholarship of the student-athlete. The lower court rejected this interpretation and, as we have shown, that decision was correct. Accordingly, let the judgment be affirmed.
AFFIRMED.
TORBETT, C.J., and JONES and SHORES, JJ., concur.
MADDOX, J., concurs in result.