Rel: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

————————————————

### SC-2022-0836

————————————————

## Tiara Young Hudson

v.

## Kay Ivey, in her official capacity as Governor of Alabama; Patrick Tuten, in his official capacity as appointee to a circuit-court judgeship in the Twenty-Third Judicial Circuit; and Tom Parker, in his official capacity as Chair of the Judicial Resources Allocation Commission

### Appeal from Montgomery Circuit Court
### (CV-22-900892)

STEWART, Justice.

This case concerns the reallocation of a circuit-court judgeship from the 10th Judicial Circuit located in Jefferson County to the 23d Judicial Circuit located in Madison County. Tiara Young Hudson, an attorney residing in Jefferson County, had been a candidate for appointment and election to the Jefferson County judgeship before its reallocation to Madison County. In response to the reallocation of that judgeship, Hudson initiated an action in the Montgomery Circuit Court ("the trial court") seeking a judgment declaring that the act providing for the reallocation of judgeships, § 12-9A-1 et seq. ("the Act"), Ala. Code 1975, violated certain provisions of the Alabama Constitution of 1901. Hudson also sought a permanent injunction removing the Madison County circuit judge that had been appointed to fill the reallocated judgeship from office and directing the governor to appoint a new person nominated by the Jefferson County Judicial Commission to fill the judgeship in Jefferson County. The trial court dismissed the action on the ground that it did not have subject-matter jurisdiction to grant the requested relief. We affirm.

<u>Facts and Procedural History</u>

On May 24, 2022, Hudson won the Democratic Party primary election to be that party's nominee for the Place 14 circuit-court judgeship

in the criminal division of Alabama's 10th Judicial Circuit for a term beginning in January 2023. On June 1, 2022, then Place 14 circuit judge Clyde Jones retired, leaving a vacancy in the Place 14 judgeship. In response to that vacancy, on June 9, 2022, the Alabama Judicial Resources Allocation Commission ("the Commission") convened and, pursuant to powers granted it by the Act,[1] voted to reallocate the Place 14 judgeship from 10th Judicial Circuit, the circuit least in need of an additional circuit-court judgeship according to a formal judicial-caseload study, to the 23d Judicial Circuit, the circuit most in need of an additional judgeship according to the same study. On July 18, 2022, Governor Kay Ivey appointed Judge Patrick Tuten, then a district judge in Madison

---

[1]Section 12-9A-2(a), Ala. Code 1975, provides, in part:

"Only in the event of a vacancy due to death, retirement, resignation, or removal from office of a district or circuit judge, the Judicial Resources Allocation Commission shall have 30 days to determine whether to reallocate such judgeship to another district or circuit. ... All reallocation decisions require a two-thirds vote of the commission members. In determining whether to reallocate such judgeship, the commission shall consider the need based on the district and court rankings as determined pursuant to Section 12-9A-1. ..."

3

County, to fill the newly reallocated circuit-court judgeship, a position he assumed the next day.

On July 19, 2022, several hours after Tuten had taken the oath of office, Hudson filed a complaint in the trial court seeking declaratory and injunctive relief. The only three defendants named in the action were Governor Ivey, who has the authority to make appointments to fill judicial vacancies; Chief Justice Tom Parker, who is the chair of the Commission; and Tuten. Specifically, Hudson asserted that the Act represented an unconstitutional delegation of the legislative authority to establish circuit-court judgeships and requested the following relief:

> "A.　Declare that the [Commission]'s duties under Ala. Code § 12-9A-2 represent an unconstitutional delegation of legislative authority, to the extent that Ala. Code § 12-9A-2 allows for the reallocation by [the Commission] of vacant judgeships;
>
> "B.　Declare invalid and unconstitutional the Governor's appointment of Patrick Tuten to serve as circuit judge in the newly created Madison County judicial seat;
>
> "C.　Preliminarily and permanently enjoin Patrick Tuten from taking the oath of office to serve as a circuit judge in the newly created Madison County seat or otherwise assuming the purported duties of that seat and exercising any authority as a circuit judge in that seat;
>
> "D.　Order the Governor to choose a candidate from those submitted by the [Jefferson County Judicial Commission] to

4

fill the Tenth Judicial Circuit, Place 14 judgeship vacancy in Jefferson County as mandated by the constitution of the State of Alabama."

The defendants jointly moved to dismiss the action based on three main grounds. First, they argued that the trial court lacked subject-matter jurisdiction because a quo warranto action -- not a declaratory-judgment action -- provided the exclusive remedy under the circumstances. Second, the defendants argued that Hudson lacked standing because she had not suffered an injury in fact and because, the defendants claimed, her purported injury was neither caused by nor capable of being redressed by the named defendants. Finally, the defendants contended that Hudson had failed to state a claim upon which relief could be granted because the legislature had lawfully empowered the Commission to reallocate the judgeship. On August 12, 2022, following a hearing and briefing by the parties, the trial court entered a judgment dismissing Hudson's action for all the reasons asserted by the defendants. Hudson timely appealed.

## Standard of Review

The defendants asserted that Hudson's action was due to be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1), Ala.

R. Civ. P., and because it failed to state a claim upon which relief could be granted pursuant to Rule 12(b)(6), Ala. R. Civ. P. On appeal, no presumption of correctness is given to a dismissal. "'We review de novo whether the trial court had subject-matter jurisdiction.'" Taylor v. Paradise Missionary Baptist Church, 242 So. 3d 979, 986 (Ala. 2017) (quoting Solomon v. Liberty Nat'l Life Ins. Co., 953 So. 2d 1211, 1218 (Ala. 2006)). "The appropriate standard of review under Rule 12(b)(6)[, Ala. R. Civ. P.,] is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle her to relief." Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993). Furthermore, this Court reviews questions of law de novo. See Ex parte Liberty Nat'l Life Ins. Co., 209 So. 3d 486, 489 (Ala. 2016).

## Analysis

We first address whether the trial court correctly concluded that Hudson's exclusive remedy in this case was to petition for a writ of quo warranto. As this Court has explained,

> "[t]he writ of quo warranto is a common law writ used to determine whether one is properly qualified and eligible to hold a public office. The writ is utilized to test whether a person may lawfully hold office, unlike impeachment, which

6

is the removal of an officeholder for inappropriate acts while lawfully holding office. See <u>Sullivan v. State ex rel. Attorney General of Alabama</u>, 472 So. 2d 970 (Ala. 1985); <u>State ex rel. Chambers v. Bates</u>, 233 Ala. 251, 171 So. 370 (1936). Stated another way, the purpose of the writ of quo warranto is to ascertain whether an officeholder is 'constitutionally and legally authorized to perform any act in, or exercise any functions of, the office to which he lays claim.' 65 Am Jur. 2d <u>Quo Warranto</u> § 122 (1972).

"In Alabama, actions for the writ of quo warranto may be brought by private citizens pursuant to Ala. Code 1975, § 6-6-591. <u>Rouse v. Wiley</u>, 440 So. 2d 1023 (Ala. 1983). Section 6-6-591 states, in pertinent part:

"'(a) An action may be commenced in the name of the state against the party offending in the following cases:

"'(1) When any person usurps, intrudes into or unlawfully holds or exercises any public office ….'

"The issuance of a writ of quo warranto must serve the public good, although it may also incidentally benefit the person or persons that institute the action. <u>Floyd v. State ex rel. Baker</u>, 177 Ala. 169, 59 So. 280 (1912); <u>State ex rel. Fuller v. Hargrove</u>, 277 Ala. 688, 174 So. 2d 328 (1965)."

<u>Ex parte Sierra Club</u>, 674 So. 2d 54, 56-57 (Ala. 1995).

A declaratory judgment, on the other hand, serves the broader function of enabling parties to obtain a judicial determination of their legal rights related to an actual controversy between them in advance of an invasion of such rights and whether or not further relief is or could be

claimed. See, e.g., <u>Harper v. Brown, Stagner, Richardson, Inc.</u>, 873 So. 2d 220, 224 (Ala. 2003) (stating that a purpose of Alabama's Declaratory Judgment Act, § 6-6-220 et seq., Ala. Code 1975, is "to enable parties between whom an actual controversy exists or those between whom litigation is <u>inevitable</u> to have the issues speedily determined when a speedy determination would prevent unnecessary injury caused by the delay of ordinary judicial proceedings").

> "'The Declaratory Judgment Act, §§ 6-6-220 through -232, Ala. Code 1975, "does not '"empower courts to … give <u>advisory opinions</u>, however convenient it might be to have these questions decided for the government of future cases."'" <u>Bruner v. Geneva County Forestry Dep't</u>, 865 So. 2d 1167, 1175 (Ala. 2003) (quoting <u>Stamps v. Jefferson County Bd. of Educ.</u>, 642 So. 2d 941, 944 (Ala. 1994) (quoting in turn <u>Town of Warrior v. Blaylock</u>, 275 Ala. 113, 114, 152 So. 2d 661, 662 (1963))) (emphasis added in <u>Stamps</u>). This Court has emphasized that declaratory-judgment actions must "settle a '<u>bona fide</u> justiciable controversy.'" <u>Baldwin County v. Bay Minette</u>, 854 So. 2d 42, 45 (Ala. 2003) (quoting <u>Gulf South Conference v. Boyd</u>, 369 So. 2d 553, 557 (Ala. 1979)). The controversy must be "'definite and concrete,'" must be "'real and substantial,'" and must seek relief by asserting a claim opposed to the interest of another party "'upon the state of facts <u>which must have accrued</u>.'" <u>Baldwin County</u>, 854 So. 2d at 45 (quoting <u>Copeland v. Jefferson County</u>, 284 Ala. 558, 561, 226 So. 2d 385, 387 (1969)). "'Declaratory judgment proceedings will not lie for an "anticipated controversy."'" <u>Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C.</u>, 828 So. 2d 285, 288 (Ala. 2002) (quoting <u>City of Dothan v. Eighty-Four West, Inc.</u>, 738 So. 2d 903, 908 (Ala. Civ. App. 1999))).'"

8

Etowah Baptist Ass'n v. Entrekin, 45 So. 3d 1266, 1274-75 (Ala. 2010)

(quoting Bedsole v. Goodloe, 912 So. 2d 508, 518 (Ala. 2005)).

Furthermore, this Court has recognized that a declaratory-judgment action cannot serve as a substitute for a quo warranto action. "[T]he exclusive remedy to determine whether a party is usurping a public office is a quo warranto action pursuant to § 6-6-591, Ala. Code 1975, and not an action seeking a declaratory judgment." Riley v. Hughes, 17 So. 3d 643, 646 (Ala. 2009) (footnote omitted). As explained in Riley, "[a] declaratory-judgment action cannot be employed where quo warranto is the appropriate remedy because the declaratory judgment would violate public policy," 17 So. 3d at 646, and is, therefore, not justiciable:

> "'This remedy [quo warranto,] "looks to the sovereign power of the state with respect to the use or abuse of franchises -- which are special privileges -- created by its authority, and which must, as a principle of fundamental public policy, remain subject to its sovereign action in so far as the interests of the public, or any part of the public, are affected by their usurpation or abuse."
>
> "'Our statute has extended the right to institute such proceeding to a person giving security for costs of the action. But, in such case, the action is still prerogative in character, brought in the name of the State, on the relation of such

person, who becomes a joint party with the State. The giving of security for the costs of the action is the condition upon which the relator is permitted to sue in the name of the State. Without such security, he usurps the authority of the State.

"'....

"'As indicated, it is the policy of the law of Alabama that [quo warranto] proceedings should be had in the name of the State, and instituted in the manner designated by statute.

"'To sanction a private action inter partes with the same objective would operate a virtual repeal of the quo warranto statute.

"'....

"'The Declaratory Judgment Law was never intended to strike down the public policy involved.'

"Birmingham Bar Ass'n v. Phillips & Marsh, 239 Ala. 650, 657-58, 196 So. 725, 732 (1940) (citations omitted).

"Where a controversy presented in a declaratory-judgment action is not justiciable, this Court may notice the defect ex mero motu."

Riley, 17 So. 3d at 646-47.

In Sierra Club, an environmental organization brought an action for a declaratory judgment and injunctive relief against the Alabama Environmental Management Commission ("the Environmental Management Commission") and the Alabama Department of

10

Environmental Management ("ADEM"), challenging the qualifications,

appointments, and confirmations of three members of the Environmental

Management Commission. The three members thereafter challenged the

circuit court's subject-matter jurisdiction to enter a consent judgment in

that action, arguing that a quo warranto action was the sole method to

review the legality of their appointments. This Court agreed, rejecting

the environmental organization's claim that the case was about

"procedure" and not whether the three members were to be permanently

removed from office:

> "A declaratory judgment action is not appropriate in this case
> because, contrary to [the environmental organization's]
> contentions, this case is not merely one concerning the
> interpretation of a statute. Rather, it directly concerns
> whether [the three members] are unlawfully exercising their
> positions as commissioners …. The question whether [the
> three members] were properly or improperly appointed and
> confirmed strikes directly at the heart of their qualifications
> for those offices. Because their qualifications for service in
> office are being questioned, the writ of quo warranto is [the
> environmental organization's] only proper remedy in this
> case. …. To suggest otherwise -- that the qualifications of [the
> three members] are not at issue -- is to ignore [the
> environmental organization's] attempts to remove them from
> office or, at least, require them to submit to another
> confirmation process.
>
> "Although Rule 57, Ala. R. Civ. P., provides for the use
> of declaratory judgment actions, Rule 81[, Ala. R. Civ. P.,]
> states that the rules are applicable 'to the extent that the

11

practice in such matters is not provided by statute'; it then notes that quo warranto proceedings 'or actions in the nature thereof' fall under this rule. Rule 81(a)(23). … [T]he Alabama legislature provided for the use of the writ of quo warranto in § 6-6-591[, Ala. Code 1975]. In contrast to the writ of quo warranto, the declaratory judgment procedure is designed to settle a justiciable controversy where each side has standing to engage the power of the courts for a determination of that controversy. In this case, however, the only question at issue at this time is the legality of the appointments of [the three members]. The consequence of an action to test whether they are entitled to hold these offices requires that the petitioner have standing. [The environmental organization] would have standing to petition the trial court for a writ of quo warranto, on behalf of the State, to determine the legality of these appointments. It does not have standing to file a declaratory judgment action under these circumstances. Even under our Rules of Civil Procedure, a declaratory judgment action is not convertible to a quo warranto action."

674 So. 2d at 58.

In this case, Hudson argues that her action was not initiated with the direct purpose of removing Tuten from office but, rather, to challenge the constitutionality of the Act under which a judgeship was removed from the 10th Judicial Circuit. She contends that her action only "collaterally implicates Judge Tuten's authority to occupy an unlawfully created [judicial] seat." Hudson's brief at 17. We cannot overlook, however, the fact that Hudson's action named Tuten as a defendant and sought a judgment declaring that Tuten's appointment was "invalid and

12

unconstitutional" and a permanent injunction prohibiting Tuten from "exercising any authority as a circuit judge." Moreover, the relief Hudson sought from Governor Ivey -- appointing a person to fill the judgeship in the 10th Judicial Circuit that has been reallocated to the 23d Judicial Circuit and is currently occupied by Tuten -- necessarily contemplates the removal of Tuten from his judicial office. In other words, this action is not one merely concerning the interpretation of a statute; rather, Hudson directly challenges Tuten's exercise of his judicial office. Under our law, such claims must be brought as a quo warranto action.

Hudson further posits that a quo warranto action will not afford her the complete relief she seeks, i.e., an adjudication on the purported unconstitutionality of the Act and a declaration that the reallocation of the judgeship was, therefore, void. We note, however, that a quo warranto action would not preclude a determination as to the constitutionality of the Act or the legality of the Commission's reallocation of a judgeship. Indeed, Hudson's challenge to Tuten's appointment and exercise of powers relates directly to the purported constitutional infirmities of the Act.

> "It is fully settled in this State that statutory quo warranto is the appropriate remedy to test the existence of a

de jure office, the same as to oust a usurper intruding into an office; and in adjudicating the existence of such office vel non, the court may determine the constitutionality of the act purporting to create the same."

Corprew v. Tallapoosa Cnty., 241 Ala. 492, 493-94, 3 So. 2d 53, 54 (1941).

Nor is a trial court precluded from issuing appropriate injunctive relief in a quo warranto action. See Tyson v. Jones, 60 So. 3d 831, 843 (Ala. 2010) (rejecting argument that a circuit court lacked jurisdiction to issue injunctive relief in a quo warranto action).

## Conclusion

Hudson's action expressly sought relief concerning whether Judge Tuten lawfully holds or exercises his judicial office. Therefore, under Alabama law, Hudson's exclusive remedy was to petition for a writ of quo warranto. We, thus, affirm the judgment of the trial court dismissing Hudson's declaratory-judgment action for want of subject-matter jurisdiction, and we pretermit discussion of the constitutionality of the Act or Hudson's standing to seek declaratory relief.[2]

AFFIRMED.

___

[2]We also do not address at this time the issue, raised for the first time in Hudson's reply brief, whether Hudson could pursue a stand-alone declaratory-judgment action against the Commission addressing only the Act's constitutionality.

14

Shaw, Wise, Bryan, Sellers, and Mendheim, JJ., concur.

Mitchell, J., concurs specially, with opinion.

Parker, C.J., and Cook, J., recuse themselves.

MITCHELL, Justice (concurring specially).

I concur in the decision to affirm the trial court's judgment.[3] I write separately to explain my concerns with certain aspects of Tiara Young Hudson's submissions to the trial court and to this Court.

I.

As the main opinion makes clear, Hudson's complaint states only one claim: a nondelegation challenge to the statute that authorizes the Judicial Resources Allocation Commission ("JRAC") to create and eliminate judgeships. Hudson does not allege a violation of the 14th Amendment to the United States Constitution, nor does she bring any claim for which racial discrimination (or any other type of discrimination)

---

[3]As the main opinion notes, our precedents establish that a petition for the writ of quo warranto is the "exclusive" mechanism for seeking to expel a public official from office. Riley v. Hughes, 17 So. 3d 643, 646 (Ala. 2009). Since Hudson's complaint expressly demands Judge Patrick Tuten's ouster from office, our precedents dictate that Hudson was required to seek relief through a quo warranto action (which comes with heightened procedural strictures) rather than a declaratory-judgment proceeding. See id. Our caselaw has also held that "the unavailability of a declaratory-judgment action as a substitute for a quo warranto action" means that any declaratory-judgment action that should have been brought as a quo warranto action suffers from "a jurisdictional defect," which renders the case nonjusticiable. Id. at 648. Hudson never asks us to reconsider these (or, indeed, any) aspects of our quo warranto caselaw and has therefore failed to identify any reversible error.

is an element. Yet the statements of fact in Hudson's complaint and opening brief begin by highlighting the fact that Hudson is "a Black female." C. 19; Hudson's brief at 6. Hudson then goes on to describe the races of various people who are involved in the case, even though their races also have nothing to do with the legal claim stated in her complaint or the questions presented on appeal.

It appears that Hudson spends so much time focusing on race -- her own race, the races of JRAC's members, and the racial demographics of Jefferson and Madison Counties -- to insinuate that JRAC's decision to reallocate the Jefferson County judgeship to Madison County was motivated by bigotry rather than by objective consideration of the factors listed in § 12-9A-1(d), Ala. Code 1975. But Hudson stops short of actually arguing that point or presenting any evidence in support of it. On the contrary, Hudson's counsel conceded below that JRAC's reallocation decision was based on the race-neutral "fact that all the studies show that Madison County is most in need and Jefferson County was the least in need" of circuit judgeships based on the two counties' respective caseloads. T. 27, C. 820. To turn around after making such a concession

17

and insinuate that the reallocation decision was motivated by racism reveals, at a minimum, questionable professional judgment.

Hudson's implicit accusations of racism are particularly puzzling given that her own filings use overtly biased language when referring to different racial groups. Those filings capitalize "Black" every time it appears but do not capitalize "white" anytime it appears, even when the two words appear side-by-side in the same sentence. See, e.g., Hudson's brief at 6, 8; C. 6, 9, 11, 12, 19, 21. The persistence of this pattern suggests that it is not an accident but instead a deliberate choice, the effect of which is to signal that certain races deserve heightened respect while others do not.

That signaling may be fashionable in certain circles,[4] but it has no place in our legal system. Our system of justice "is color-blind, and

_____

[4]See, e.g., Explaining AP Style on Black and white, Associated Press (July 20, 2020), currently available at: www.apnews.com/article/9105661462 (explaining that "AP's style is now to capitalize Black in a racial, ethnic or cultural sense" but stating that "AP style will continue to lowercase the term white in racial, ethnic and cultural senses" because white people lack shared "history and culture" and because "white people's skin color plays into systemic inequalities and injustices"); Nancy Coleman, Why We're Capitalizing Black, N.Y. Times (July 5, 2020), currently available at: www.nytimes.com/2020/07/05/insider/capitalized-black.html and archived at: https://perma.cc/747M-335G ("our policy will now capitalize

neither knows nor tolerates classes among citizens." Plessy v. Ferguson, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). Displays of racial bias would be shameful no matter the source, but they are especially troubling coming from a legal organization (the Southern Poverty Law Center) that purports to advance racial equality. It should -- but apparently does not -- go without saying that the act of singling out certain races for special

_____

'Black' but not 'white' "); Mike Laws, Why we capitalize "Black" (and not "white"), Colum. Journalism Rev. (June 16, 2020), currently available at: www.cjr.org/analysis/capital-b-black-styleguide.php and archived at: https://perma.cc/3RCA-BKJW (arguing that it should be "take[n] as a given that Black ought to be capitalized," while "white" should not be, and mocking "fusspot grammarians" who believe that the two races should be treated equally when it comes to capitalization).

In my own writing, I do my best to follow the rule I was taught in grade school: capitalize proper nouns and adjectives while leaving common nouns and adjectives lowercase. Since black and white have traditionally been treated as common adjectives, I prefer to leave them both lowercase. In contrast, I capitalize proper adjectives like African, European, and Asian. Others take the view that any descriptor for a racial or ethnic group should be treated as a proper adjective and that, as a result, black and white should be capitalized whenever they refer to groups of people. Our Court of Criminal Appeals, for example, has done this. See, e.g., Smith v. State, [Ms. CR-17-1014, Sept. 2, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022) ("The struck jury consisted of nine White members and three Black members."). I have no issue with that approach as long as it's applied to all groups equally. But that is not the approach taken by Hudson's attorneys, who have rejected any evenhanded rule and instead use capitalization in a way that signals heightened regard for favored groups at the expense of other groups.

favor or disfavor does nothing to advance our nation's shared commitment to "equality before the law." Id. at 562.

## II.

Racialized language is not the only example of inappropriate material in Hudson's brief. Hudson's attorneys also chose to list their preferred personal pronouns in their briefs' signature blocks, even though that information has no relevance to their client's legal arguments or to the attorneys' ability to practice before the Court. I don't recall seeing this practice in any briefs previously filed with our Court, and I regard this novel use of the signature block as improper. Lawyers sign pleadings in order to verify those pleadings, not to convey biographical details about themselves.

The Alabama Rules of Appellate Procedure exempt "signature blocks" from a brief's word count, see Ala. R. App. P. 28(j) and 32(c), based on the manifest presumption that signature blocks will be used only to convey information necessary to enable attorneys to receive correspondence and to verify the attorneys' ability to practice before the Court (such as the attorneys' names, bar numbers, email and physical addresses, and phone numbers). Extraneous information -- including

information about attorneys' personal histories or their membership in political, religious, sexual, racial, or other identity groups -- is inappropriate. Inclusion of such information can create the appearance that an attorney is attempting to circumvent word-count limitations or, more seriously, to curry favor based on the attorneys' political views or identity-group memberships (imagine an advocate who puts a "†" or "><>" next to his or her name when practicing before a panel of all Christian judges).

Counsel in future cases should be aware that inclusion of irrelevant information in a brief's signature block may result in that brief's being stricken as noncompliant. Our Court may also benefit from adopting amendments to the Alabama Rules of Appellate Procedure and other rules of court that make this explicit.

* * *

One unfortunate consequence of the recent trend toward lawyer-driven litigation is that it tends to elevate ideological signaling over substantive legal arguments. This case is an example. The legal disputes here are about subject-matter jurisdiction and nondelegation principles; they have nothing to do with race, sex, or professions of gender identity.

21

Yet repeated references to these latter characteristics are made throughout Hudson's filings in this case, for no apparent reason other than to make an ideological point. I caution attorneys practicing in our courts not to repeat these tactics in future cases.